NOT DESIGNATED FOR PUBLICATION

No. 118,067

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

ASHLEY LYNN KLINE,
*Appellee*,

v.

REBECCA JOANNA HOLMES,
*Appellant*.

MEMORANDUM OPINION

Appeal from Douglas District Court; SALLY D. POKORNY, judge. Opinion filed April 6, 2018.
Reversed and remanded with directions.

*Adam M. Hall* and *Sarah E. Warner*, of Thompson Warner, P.A., of Lawrence, for appellant.

*Lisa M. Williams-McCallum*, of Williams Family Law, of Topeka, for appellee.

Before MCANANY, P.J., GARDNER, J., and TIMOTHY L. DUPREE, District Judge, assigned.

PER CURIAM: Rebecca Holmes became pregnant in September 2014 after several attempts at artificial insemination. Days prior to her insemination resulting in a successful pregnancy, she met Ashley Kline. Kline was unaware of Holmes' plans. Immediately after learning she was pregnant, Holmes ended the nascent relationship with Kline and moved to Kansas. Several weeks later, Holmes informed Kline she was pregnant. They then established a long-distance relationship. The women discussed raising the child together and had a co-parenting agreement drafted, but neither woman signed it. When the child, D.H., was approximately four months old, Kline moved to Kansas but would travel out of state for work for weeks or months at a time. The relationship was volatile

1

and ended right after D.H.'s first birthday. Approximately four months later, Kline filed a petition for determination of parentage. After a March 2017 trial, the district court found Kline met the statutory definition of a mother to D.H. under the Kansas Parentage Act (Act). We reverse the district court's finding and remand the case with instructions.

*Factual and procedural background*

For years Holmes wanted to be a mother and attempted insemination multiple times. In late August of 2014, Holmes, then living in Seattle, met Kline. Kline was unaware of Holmes' plans to become pregnant and of all of Holmes' insemination attempts.

On September 26, 2014, Holmes learned she was pregnant, broke up with Kline, and moved back to Kansas. Kline and Holmes stayed in touch after Holmes returned to Kansas, and on October 14, 2014, Holmes informed Kline via text message that she was pregnant. Holmes did not tell Kline of her pregnancy before moving because she did not intend for the relationship to continue. Kline's recollection was that Holmes moved back to Kansas approximately two weeks after they began dating, and Kline acknowledged she learned of Holmes' pregnancy after knowing Holmes for a month and a half. Although Holmes testified that she did not plan to have a family with Kline, she and Kline attempted to reconcile and entered into a long-distance relationship.

In November 2014, Kline flew to Kansas from Washington and attended Holmes' first prenatal appointment. Kline attended alternating doctor appointments thereafter, unless she was working at her seasonal job in Alaska. Kline attended approximately four prenatal appointments during visits to Kansas but did not help Holmes pay for any of the prenatal visits.

2

In December 2014, when Holmes was approximately three months pregnant, Kline and Holmes mailed a pregnancy announcement to friends and family, which read: "'With a little help from your friends at Pacific Northwest Fertility, we are pleased to announce the upcoming birth of our son, [D.H.]. Wishing you a happy holiday and many blessings in the new year. Love, Rebecca and Ashley.'"

In the early months of her pregnancy, Holmes visited Kline twice in Seattle: in December 2014 and then again in January 2015.

In December 2014 or January 2015, at Kline's request, Holmes contacted an attorney with an email written by Kline, which stated, "The ultimate goal is for [Kline] to be able to be the other legal parent of [D.H.]." Kline's expectation of her rights as a parent included visitation and being able to Facetime with D.H. if she chose to move back to Seattle. The attorney presented four options to Holmes in order to meet the stated goal: marriage, adoption, entering into a parenting contract, or writing a will.

In late January 2015, Holmes received some documents from her attorney. Holmes forwarded those documents to Kline, including a draft of a co-parenting agreement, as well as a draft of a will for Kline. Kline testified she signed the will, which made provisions for D.H., but she could not remember who witnessed the signing, nor did she provide an executed copy of the will at trial. Neither Holmes nor Kline signed the co-parenting agreement. Holmes testified she felt pressured by Kline to get the co-parenting agreement from the attorney. Kline testified she declined to sign the co-parenting agreement because she did not want to be held to a provision requiring her to live within 120 miles of D.H. in the event she and Holmes broke up. She testified that she had no ties in Kansas and wanted to go back to Seattle. Kline acknowledged she did not independently seek the assistance of an attorney and did not work to formalize rights to visitation with D.H.

3

In February 2015, two friends of Holmes hosted a baby shower for her. Holmes requested that her friends include Kline's name on the baby shower invitations. Kline was not present at this shower because she was working in Alaska. However, early in April 2015, Holmes' aunt hosted another baby shower for Holmes, which included "[m]ostly family." Kline testified that she was present at this shower, received gifts with Holmes, and sent out joint thank you notes.

Kline testified she attended one of a series of child-birth classes with Holmes in April 2015, for which Holmes paid. Kline acknowledged that Holmes attended other classes without her. Kline refused to participate in the one child-birth class she attended. When Kline visited Holmes in Kansas, she prohibited Holmes from going back to subsequent classes.

Holmes gave birth to D.H. in May 2015; Kline was not present. Kline arrived in Kansas the day after D.H. was born. Kline testified she received congratulatory posts on her Facebook page regarding the birth of D.H. Kline's mother, two sisters, and a cousin came to Kansas to meet D.H. after he was born.

Holmes testified that while in the hospital and in the days after D.H. was born, Kline became emotionally abusive. Holmes, who delivered in the same hospital where she worked, had many coworkers who were excited to visit and meet D.H. According to Holmes, Kline demanded that Holmes keep all visitors away, including Holmes' father. Kline would become angry if others visited while she was with D.H. Kline accused Holmes of being provocative and lacking in modesty when the nurse came in to help Holmes breastfeed D.H. After a doctor and nurse visited to offer congratulations, Kline accused Holmes of sleeping with them. Kline also refused to help Holmes connect to D.H. for breastfeeding.

Holmes did not allow birth pictures to be taken in the hospital, and she kept an announcement out of the newspaper because she did not want to list Kline in the announcement. Further, Holmes did not want Kline's name on the birth certificate. Holmes testified, "[Kline] was not a part of it."

Kline flew back to her job in Alaska in June 2015. In July 2015, Kline suggested to Holmes that they create an email account for D.H. as a time capsule for him to open on his 18th birthday. Holmes liked the idea and created the account.

In August 2015, Holmes and D.H., then three months old, visited Kline in Alaska for one week. That month, Holmes wrote a letter to D.H. at the email account, in which she stated she was thankful she "found mom to be my partner in raising you." When Kline's job ended for the season later that month, she moved to Kansas.

Kline lived with Holmes and D.H. from late August 2015 until late May 2016. Holmes testified that when Kline was in Kansas, she would pump milk into bottles so Kline could feed D.H. to try and bond with him, but Kline refused.

According to Kline, in the first year of D.H.'s life, she was away for a total of approximately four months due to her seasonal work in Alaska. While away from Kansas, Kline would utilize Facetime to see Holmes and D.H. This occurred a total of approximately five times after D.H. was born. Two of those occasions were in July 2016, after Kline and Holmes broke up in May 2016. A July 31, 2016, Facetime session was the last time Kline saw D.H. before Holmes ceased contact with her.

Kline's last physical time with D.H. was before she moved back to Washington in May 2016. Holmes testified that neither she nor D.H. had seen Kline in nearly a year. At the time of trial D.H. was nearly two years old, and Holmes testified that D.H. had no memory of Kline and no bond with her.

5

Susan Holland, a co-worker and friend of Holmes, testified that they shared a small office from April 2015 to December 2016. Holmes never talked about sharing parenting rights with Kline or held Kline out as an adoptive mother or co-parent.

Kline acknowledged there was no co-parenting agreement in place. She was never engaged or married to Holmes, she was not a party to any contract for semen, and she never attended any of Holmes' insemination appointments. Kline further acknowledged her name was not on the birth certificate, she had no biological connection to D.H., and she never attempted or made a request to adopt D.H.

Holmes alone paid for the expenses involved in getting pregnant and delivering D.H. She paid for the semen, the inseminations, the doctor bills, and the hospital delivery bills without assistance from Kline. Holmes testified that, as of trial, she was still paying off the $8,000 hospital bill for the delivery of D.H. Holmes also testified that she spent approximately $11,000 per year for D.H.'s daycare expenses.

Holmes testified she and Kline had a verbal agreement that Kline would "help pay the bills." However, Kline testified she was unaware that Holmes' mortgage payment and utility expenses alone came to approximately $1,700 per month while she resided with Holmes. Kline acknowledged that half of those living expenses for the approximate 10 months she lived with Holmes would have been at least $8,500.

From the time D.H. was approximately two months old, until the relationship ended, Kline gave Holmes checks in various amounts and at varying intervals. The total amount of the checks was $14,872. Kline claimed the checks she gave to Holmes were financial support, but acknowledged that some of the money was intended to reimburse Holmes for her assistance in paying Kline's medical expenses and to retrieve Kline's car from being impounded.

6

Holmes testified that during their relationship there were many times when she paid for Kline's expenses because Kline did not have money when her expenses were due. According to Holmes, Kline's expenses amounted to several thousand dollars and all of the money Kline gave to her was to reimburse her. Holmes testified there was nothing left over to put towards meeting D.H.'s needs.

Kline filed an affidavit along with her petition for determination of parentage in September 2016, in which she claimed she lived with Holmes and D.H. from the day he was born in May 2015 until May 25, 2016. Kline also claimed in these documents that her relationship with Holmes began in early August 2014 and ended on July 31, 2016, and that she and Holmes conceived D.H. together through artificial insemination. Kline stated, "[B]oth the mother and I worked with European Sperm Bank, (ESBUSA) Seattle, Washington to purchase semen for use in artificial insemination of [Holmes]." Likewise, in her January 2017 pretrial questionnaire, Kline reiterated her contention that at the time of D.H.'s conception she and Holmes purchased the semen together for the purpose of having a child together. The district court observed that these representations of events by Kline were not true based on her testimony at trial.

After taking evidence on March 31, 2017, the district court found this case was "representative of any other where one person acts as the parent of another person's child, regardless of sexual identity," and that Kline had "openly and notoriously acknowledged being a parent to the minor child since prior to birth, and therefore is determined [by the Court] to be a parent to [D.H.]."

Holmes requested the district court certify its decision from the March 31 proceeding as a final judgment to allow for an immediate appeal and to stay the pending proceedings regarding custody, parenting time, and child support until the outcome of the appeal. On June 21, 2017, the district court granted both requests. Holmes timely filed

her notice of appeal of any adverse rulings up to and including the final judgment of parentage.

*Did the district court abuse its discretion in concluding that Kline met the statutory definition of a parent?*

Holmes raises two issues on appeal. First, Holmes contends the district court erred as a matter of law by finding that Kline is a mother of D.H., as Kline is not related to D.H. either biologically or through adoption. Second, Holmes contends the district court's interpretation of the Act was an unconstitutional infringement on her right to parent her child. Kline contends that the presumption of parentage was proper as an evidentiary foundation sufficient to support the district court's conclusion that she met the statutory definition of a parent.

Under the Act, the parent-child relationship is defined as "the legal relationship existing between a child and the child's biological or adoptive parents incident to which the law confers or imposes rights, privileges, duties and obligations." K.S.A. 2016 Supp. 23-2205; see K.S.A. 2016 Supp. 23-2201, et seq. Kline argues that Holmes' reading of this definition is narrow, incorrect, and incomplete because the Act provides other presumptive paths to parenthood under certain circumstances. See K.S.A. 2016 Supp. 22-2208(a). Holmes argues the district court erred in using an evidentiary presumption as the ultimate test for parentage under the Act.

Interpretation of a statute is a question of law over which appellate courts have unlimited review. *Neighbor v. Westar Energy, Inc.*, 301 Kan. 916, 918, 349 P.3d 469 (2015). The most fundamental rule of statutory construction is that the intent of the Legislature governs if that intent can be ascertained. *State ex rel. Schmidt v. City of Wichita*, 303 Kan. 650, 659, 367 P.3d 282 (2016). An appellate court must first attempt to

ascertain legislative intent through the statutory language enacted, giving common words their ordinary meanings. *Ullery v. Othick*, 304 Kan. 405, 409, 372 P.3d 1135 (2016).

Kline does not contend she adopted D.H, so the question of Kline's parentage under the Act turns on whether Kline can establish a biological connection—albeit a legal fiction—to D.H. to meet the definition of a parent. See K.S.A. 2016 Supp. 23-2205. The district court, in essence, found that because Kline "openly and notoriously acknowledged being a parent" to D.H., she established the presumptive biological connection to the child sufficient to establish her parentage.

Kansas statutes provide that for a mother to establish a parent-child relationship, she may provide proof of giving birth to the child or otherwise under the Act. See K.S.A. 2016 Supp. 23-2207(a). A father may establish the relationship under the Act or by a voluntary acknowledgment of paternity by written form. K.S.A. 2016 Supp. 23-2207(b); see K.S.A. 2016 Supp. 23-2204. Kline contends she established her parentage of D.H. under the Act, pursuant to the paternity presumption under K.S.A. 2016 Supp. 23-2208(a)(4), which states:  "The man notoriously or in writing recognizes paternity of the child, including but not limited to a voluntary acknowledgement made in accordance with K.S.A. 2016 Supp. 23-2223 [amending birth certificate] or K.S.A. 2016 Supp. 65-2409a [amending birth certificate], and amendments thereto." Finding that Holmes sent pregnancy announcements including Kline's name, agreed to Kline being listed on the baby shower invitations, and referred to Kline as "mom" in the time capsule email account for D.H., the district court agreed with Kline that she "notoriously" recognized her parentage of D.H. and found that Kline is a mother of D.H.

Holmes contends that the district court erred in its findings and conclusions because (1) the presumption does not apply to Kline; (2) even if it does apply, it was successfully rebutted; and (3) having rebutted the presumption, Kline failed to provide

evidence sufficient to prove her paternity. Holmes' argument, at its core, is that the district court erred by using the initial presumption as the final test for Kline's parentage.

A. *The presumption*

Despite the title of K.S.A. 2016 Supp. 23-2208 being "Presumption of paternity," Kline argues that K.S.A. 2016 Supp. 23-2208(a), when harmoniously read with K.S.A. 2016 Supp. 23-2220 "sets out the presumptions of parentage," which do apply to her. The fourth presumption, which was utilized here by Kline and the district court, involves holding oneself out to be a father either by a formal writing under relevant statutes or by "notoriously . . . recognizing paternity of the child." K.S.A. 2016 Supp. 23-2208(a)(4).

However, Holmes argues there is no ambiguity in the Act. When a statute is plain and unambiguous, an appellate court should not speculate about the legislative intent behind that clear language, and it should refrain from reading something into the statute that is not readily found in its words. *Ullery*, 304 Kan. at 409. Holmes argues, in constructing K.S.A. 2016 Supp. 23-2208, the Legislature did not use the word "parentage" but "paternity." "Paternity" is defined as "[t]he quality, state, or condition of being a father, esp. a biological one; fatherhood." Black's Law Dictionary 1306 (10th ed. 2014). "Parentage," on the other hand, is defined as "[t]he quality, state, or condition of being a parent; kindred in the direct ascending line." Black's Law Dictionary 1288 (10th ed. 2014). Holmes contends that if the Legislature intended for the Act to encompass parentage rather than paternity, it would have used that language.

"This court may correct clerical errors or inadvertent errors in terminology if the intent of the legislature is plain and unmistakable." *Ft. Hays St. Univ. v. University Ch., Am. Ass'n of Univ. Profs.*, 290 Kan. 446, 464, 228 P.3d 403 (2010). However, "'[a]ppellate courts cannot delete vital provisions or add vital omissions to a statute if the legislature failed to enact the change as intended under any reasonable interpretation of

10

the language used, regardless of the legislature's intention. Only the legislature may remedy these types of error.'" *Eastman v. Coffeyville Resources Refining & Marketing*, 295 Kan. 470, 476, 284 P.3d 1049 (2012) (quoting *Ft. Hays St. Univ.*, 290 Kan. at 464). See *Bussman v. Safeco Ins. Co. of America*, 298 Kan. 700, 725, 317 P.3d 70 (2014).

Notwithstanding the plain language of K.S.A. 2016 Supp. 23-2208, Kline correctly points to K.S.A. 2016 Supp. 23-2220 and relies on *Frazier v. Goudschaal*, 296 Kan. 730, 746-47, 295 P.3d 542 (2013). Under K.S.A. 2016 Supp. 23-2220, the provisions of the Act applicable to determining the existence of a father and child relationship also apply in determining the existence of a mother and child relationship, insofar as practicable. In *Frazier*, the Kansas Supreme Court held that "[a] harmonious reading of all of the KPA provisions indicates that a female can make a colorable claim to be a presumptive mother of a child without claiming to be the biological or adoptive mother." 296 Kan. at 747. Consequently, *Frazier* is a gateway that allows a woman to utilize practicable provisions of the Act in support of her claim of parentage. In the context of this case, Kline's argument that she meets the "notorious" presumption of parentage has a lawful foundation.

B. *The rebuttal*

Holmes contends, however, that in treating the presumption of Kline's paternity as conclusive of her parentage, the district court abused its discretion. A judicial action constitutes an abuse of discretion if (1) no reasonable person would take the view adopted by the trial court; (2) the action is based on an error of law; or (3) the action is based on an error of fact. *Wiles v. American Family Life Assurance Co.*, 302 Kan. 66, 74, 350 P.3d 1071 (2015). An abuse of discretion occurs if discretion is guided by an erroneous legal conclusion or goes outside the framework of or fails to consider proper statutory limitations or legal standards. See *Matson v. Kansas Dept. of Corrections*, 301 Kan. 654, 656, 346 P.3d 327 (2015). In this case, the district court found that "openly and

11

notoriously acknowledging the child is your own . . . is the test for paternity." Holmes argues that this ruling is demonstrative that the district court erred as a matter of law and thereby abused its discretion in finding that Kline is a parent. Holmes' argument is persuasive.

Under K.S.A. 2016 Supp. 23-2208(b), the presumption that Kline is a parent to D.H. because she notoriously acknowledged her paternity of the child may be rebutted by clear and convincing evidence. Clear and convincing evidence is evidence "sufficient to establish that the truth of the facts asserted is 'highly probable.'" *In re B.D.-Y.*, 286 Kan. 686, 696, 187 P.3d 594 (2008). Clear and convincing evidence is an intermediate standard of proof between a preponderance of the evidence and beyond a reasonable doubt. 286 Kan. at 691.

Holmes contends she successfully rebutted Kline's presumption of paternity. However, the district court's analysis began and ended with finding Kline established her parentage because she established a presumption of her parentage. The district court did not acknowledge the presumption as rebuttable and did not engage in an analysis of the facts under K.S.A. 2016 Supp. 23-2208(b) as to whether Holmes provided clear and convincing evidence to rebut that presumption.

C. *Kline's burden to establish paternity or parentage*

Nevertheless, Kline concedes on appeal that Holmes successfully rebutted the presumption that Kline was a parent. Kline acknowledges it was incumbent upon her to provide evidence of her parentage to overcome Holmes' rebuttal pursuant to K.S.A. 2016 Supp. 23-2213. However, just as the district court did not address Holmes' rebuttal of Kline's presumption of parentage, it did not determine whether Kline successfully overcame Holmes' rebuttal.

12

In its findings and conclusions, the district court made several errors: (1) failing to acknowledge and address that Kline's presumption of parentage was rebuttable; (2) failing to address whether Holmes successfully rebutted the presumption with clear and convincing evidence; if so, then (3) failing to address whether Kline overcame Holmes' rebuttal; and (4) ultimately concluding that the notorious acknowledgment presumption was, itself, the test for parentage. In finding that the evidence in support of the presumption was alone sufficient to establish that Kline was a parent to D.H., as defined under the Act, the district court erred as a matter of law and thus abused its discretion.

We reverse the district court's finding that because Kline met a presumption of paternity, she met the statutory definition of a parent. Accordingly, we remand the matter to the district court with instructions to (1) determine whether Holmes rebutted Kline's presumption of paternity by clear and convincing evidence and, if so, (2) whether Kline successfully overcame Holmes' rebuttal.

Having reversed the district court's findings and remanded the case, it is not necessary to address Holmes' second issue regarding whether the district court's interpretation of the Act was an unconstitutional infringement on Holmes' right to parent her child.

Reversed and remanded with instructions.